# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF OKLAHOMA

| | |
|---|---|
| BARRY C. SCHULTZ, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) Case No. 06-CV-622-GKF-PJC |
| | ) |
| UNUMPROVIDENT CORPORATION, | ) |
| a foreign corporation; UNUM LIFE | ) |
| INSURANCE COMPANY OF AMERICA, | ) |
| a foreign corporation; and UNUM | ) |
| CORPORATION, a foreign corporation, | ) |
| | ) |
| Defendants. | ) |

## OPINION AND ORDER

Plaintiff Barry C. Schultz ("Schultz") brings this suit under the Employee Retirement Income Security Act, 29 U.S.C. §1001, *et seq.* ("ERISA"), seeking judicial review of his claim that defendants, UnumProvident Corporation, Unum Life Insurance Company of America, and Unum Corporation (collectively, "Unum"), have underpaid benefits owed to him under a long term total disability insurance policy.

### I.  Standard of Review

Unum, as administrator of the disability plan, had discretion under the plan to determine Schultz's eligibility for benefits and interpret the terms and provisions of the policy. [AR UACL02828; UACL02822].  Therefore, the court's review is limited to determining if the decision was arbitrary or capricious.  *Firestone Tire & Rubber Co. v. Bruch,* 489 U.S. 101, 115 (1989); *LaAsmar v. Phelps Dodge Corporation Life, Accidental Death & Dismemberment and Dependent Life Insurance Plan,* 605 F.3d 789, 796 (10th Cir. 2010);  *Chambers v. Family Health Plan Corporation,* 100 F.3d 818, 825 (10th Cir. 1996); *Sandoval v. Aetna Life and Casualty Insurance Co.,* 967 F.2d 377, 380 (10th Cir. 1992).

At one time, the Tenth Circuit took the position that where the claim administrator is also the insurer of the plan, an "inherent conflict of interest" exists, and the administrator "bears the burden of proving the reasonableness of its decision pursuant to this court's traditional arbitrary and capricious standard." *Fought v. UNUM Life Ins. Co. of America,* 379 F.3d 997, 1006 (10th Cir. 2004). However, the Supreme Court rejected such burden-shifting rules in *Metro. Life. Ins. Co. v. Glenn,* 544 U.S. 105, 128 S.Ct. 2343 (2008). The standard for review, after *Glenn*, has been articulated by the Tenth Circuit as follows:

> Following *Glenn,* we now weigh all conflicts of interest–be they standard or inherent–as a factor in our review. *See Holcomb v. Unum Life Ins. Co. of Am.,* 578 F.3d 1187, 1192-93 (10th Cir. 2009). In our analysis, "any one factor will act as a tiebreaker when the other factors are closely balanced, the degree of closeness necessary depending upon the tiebreaking factor's inherent or case-specific importance." *Glenn,* 128 S.Ct. at 2351. That is, a conflict of interest affects the outcome at the margin, when we waver between affirmance and reversal. A conflict is more important when "circumstances suggest a higher likelihood that it affected the benefits decision," but less so when the conflicted party "has taken active steps to reduce potential bias and to promote accuracy." *Id.*

*Hancock v. Metropolitan Life Insurance Company,* 590 F.3d 1141, 1155 (10th Cir. 2009). Thus, the court must review Unum's decision to discontinue benefits according to an arbitrary and capricious standard by applying a "combination-of-factors" method of review that allows the court to "tak[e] account of several different, often case-specific, factors, reaching a result by weighing all together." *Holcomb,* 578 F.3d at 1193, quoting *Glenn.* A conflict "should prove more important (perhaps of great importance) where circumstances suggest a higher likelihood that it affect the benefits decision ... [and] should prove less important (perhaps to the vanishing point) where the administrator has taken active steps to reduce potential bias and promote accuracy...." *Id.*, quoting *Glenn.*

Indicia of arbitrary and capricious decisions include lack of substantial evidence, mistake

2

of law, bad faith, and conflict of interest by the fiduciary. *Hancock,* 590 F.3d at 1155. To survive the court's review, the insurer's decision "need not be the only logical one nor even the best one. It need only be sufficiently supported by facts within [the insurer's] knowledge to counter a claim that it was arbitrary or capricious. The decision will be upheld unless it is not grounded on any reasonable basis." *Id.*, citing *Finley v. Hewlett-Packard Co. Employee Benefits Org. Income Prot. Plan,* 379 F.3d 1168, 1176 (10th Cir. 2004) (internal quotation marks omitted).

## II. Background/Terms of Policy

Schultz, a former employee of BCS Industries, Inc. ("BCS"), had long term disability insurance coverage under Unum Policy No. 510750 001 (the "Policy") issued by UNUM to BCS on October 1, 1996 [UACL 02838-UACL 02798].[1] With respect to calculation of long term benefit payments, the Policy provided:

> We will follow this process to figure your payment:
>
> 1. Multiply your monthly earnings by 60%.
> 2. The maximum **monthly benefit** is $6,000.
> 3. Compare the answer from Item 1 with the maximum monthly benefit. The lesser of these two amounts is your **gross disability payment.**
> 4. Subtract from your gross disability payment any **deductible sources of income.**
>
> The amount figured in Item 4 is your **monthly benefit.**

[UACL 02820]. The Policy further provided:

> ***MONTHLY BENEFIT*** *means the total benefit amount for which an employee is insured under this plan subject to the maximum benefit.*
>
> ***GROSS DISABILITY PAYMENT*** *means the benefit amount before UNUM subtracts deductible sources of income and disability earnings.*

---

[1] BCS Industries, Inc. was the holding company for and did business as Custom Building Services, Inc. ("CBS, Inc."). [Doc. No. 49 at 2]. BCS d/b/a CBS, Inc. purchased the Policy at issue. [*Id.*]

3

> ***DEDUCTIBLE SOURCES OF INCOME*** *means income from deductible sources listed in the plan which you receive or are entitled to receive while you are disabled. This income will be subtracted form your gross disability payment.*

[*Id.*]. The term "monthly earnings" was defined as follows:

> "Monthly earnings" means your gross monthly income from your Employer in effect just prior to your date of disability. It includes your total income before taxes, but does not include deductions made for pre-tax contributions to a qualified deferred compensation plan, Section 125 plan, or flexible spending account. It does not include income received from commissions, bonuses, overtime pay, any other extra compensation, or include income received from sources other than your Employer.

[UACL02819]. The Policy stated, "UNUM will subtract from your gross disability payment the following deductible sources of income: ...[t]he amount that you receive from a third party (after subtracting attorney's fees) by judgment, settlement or otherwise." [UACL02817-UACL01816].

The Policy provides that "[t]he amount that you receive as retirement payments or the amount your spouse and children receive as retirement payments because you are receiving retirement payments under...the United States Social Security Act" will be subtracted from the gross disability payment. [UACL 02817]. Further, the Policy states:

> Once UNUM has subtracted any deductible source of income from your gross disability payment, UNUM will not further reduce your payment due to a cost of living increase from that source.

[UACL 02815].

> The Policy provides:
>
> UNUM has the right to recover any overpayments due to:
>
> - fraud;
> - any error UNUM makes in processing a claim; and
> - your receipt of deductible sources of income.
>
> You must reimburse us in full. We will determine the method by which the repayment is to be made.

[UACL02808].

The Policy provides, "When making a benefit determination under the policy, UNUM has discretionary authority to determine your eligibility for benefits and to interpret the terms and provisions of the policy." [UACL02828].

### III. Plaintiff's Disability Claims History

Plaintiff was injured in a boating accident on July 4, 2003. He was subsequently determined by Unum to be totally disabled. [UACL02286-UA02284].

### A. Determination of Monthly Disability Payment

In determining plaintiff's monthly disability payment, Unum relied upon the "Employer Statement" section of plaintiff's claim, completed by Traci McGee, the office manager of plaintiff's employer and received by Unum on October 27, 2003. [UACL02985]. McGee checked the box on the form which indicated plaintiff's premiums for short term disability were paid "pre-tax." [*Id.*] On November 10, 2003, Unum Associate Customer Care Associate Tracey Jullienne spoke with David Heavin, the employer's vice president of human resources, who confirmed the premiums for plaintiff's long term disability had been paid with pre-tax dollars. [UACL02460-02459]. Carolyn Holmquist, a Unum CPA, calculated plaintiff's benefits, noting various pre-tax items which would not be included in plaintiff's gross disability benefits. [UACL02736]. By letter dated November 18, 2003, 2003, Unum notified plaintiff his claim for long term disability had been approved and he would receive monthly disability payments of $5,360.13 ($5,804.15 in Basic Benefit less Social Security tax of $359.86 and Medicare tax of $84.16 per month) beginning October 2, 2003. [UACL02286, UACL2280].

On December 5, 2005, plaintiff provided Unum's Tax Department with his sworn

5

affidavit stating that the long term disability premiums had been paid with post-tax dollars. [UNUM-3rd SUPPLEMENT-00009]. Plaintiff stated therein:

> While my premium payments to Unum for my LTD insurance were made by CBS, Inc., it was merely for convenience. Said premiums were not withheld from my payroll checks, nor were they paid with pre-tax dollars, as evidenced by the payroll printout attached (which show no deduction for said premiums). The Unum disability premium payments, along with my health insurance, my AFLAC premiums, my car benefit, and my 401k contributions, were "grossed up" at the end of the year and included my taxable income on my W-2s, meaning I paid all premium payments with 100% post-tax dollars. This was done because I didn't pass the IRS fairness tests for participation as an employee because I was the owner, and in later corporate history, son of the primary shareholder. Please see attached W-2s, box 14.

[*Id.*]. Box14 (other income) of the 2000 W-2 from the employer showed other income of $1,269.42 [UNUM-3rd SUPPLEMENT-00012]. Box 14 of the 2001 W-2 showed $2,224.65 for "Health/Aflac", $2,373.46 for "Car" and $2,500.00 for "Other." [UNUM-3rd SUPPLEMENT-00011]. Box 14 of the 2002 W-2 showed $3,120.52. [UNUM-3rd SUPPLEMENT-00010].

On December 13, 2005, Unum's Customer Care Tax Unit agreed to classify plaintiff's benefits as non-taxable based on the affidavit. [UACL00298]. Unum issued corrected W-2's for the years 2003 and 2004 that showed $0.00 for Box 1 (Wages, tips, other compensation). [UNUM-3RD SUPPLEMENT-00004-00007]. The W-2 issued by Unum for 2009 also showed no amount in Box 1. [UNUM-6th Supplement-000003].

By letter to Unum's Benefits Center dated February 2, 2006, counsel for plaintiff alleged Unum's calculation of plaintiff's monthly benefit was incorrect. [UACL00919-00918]. She contended plaintiff had not met the IRS fairness tests for employee participation in benefits, and while payments and contributions were made from payroll "for convenience, his income was grossed up for such benefits at each year end and included in his W-2s. Thus he declared the payments as income and paid taxes on them." [*Id.*]. W-2 forms from his employer for 2001 and

2002 were attached to the letter, but no W-2 form from his employer for 2003 was attached. [[UACL00917-00916]. By letters dated February 21, 2006, and March 2, 2006, counsel for plaintiff reiterated her claim that Unum had improperly calculated plaintiff's monthly benefit. [UACL 00939-00920; UACL00892-00890]. Two W-2 forms for 2003 from plaintiff's former employer were attached to the March 2, 2006 letter. [UACL-00889-00888].

Unum requested additional documentation from plaintiff [UACL00971-00970] and the employer [UACL00860, UACL 00857-00856]. Unum obtained documents from the employer and communicated with the employer's human resources vice president, Heavin, about the documents [UACL00857-00856; UACL00765-UACL00760]. Heavin informed Unum that (1) plaintiff was not the owner of the company and never had been; (2) the company did not have a deferred compensation program; (3) the deductions for 401K and flexible spending programs were *not* included in his W-2 as part of his gross wages at the end of the year; (3) the company had issued two 2003 W-2s.[2] The second W-2 listed the correct Box 1 amount. [UACL00761]. Neither listed any amount in Box 14 ("Other"). [*Id.*]. Heavin also advised that in 2005, the company issued a 2003 1099 to Schultz for $33,300, which is the amount of "unauthorized bank transfers made by Mr. Schultz to his personal bank account in 2003" and was "part of an insurance fraud claim (which was collected) and ongoing criminal proceedings." [*Id.*]. Heavin stated that no additional income had been provided to plaintiff by the company from July 4, 2003 to the present. [*Id.*]. He advised that a 1099-R for 2003 from Nationwide Life Insurance Company in the amount of

---

[2]The original W-2 had included disability payments of $5,360.13 from Unum. Because Unum issued a separate W-2 for the disability payments it had made, the company issued a corrected W-2 deducting that amount from Box 1 ("Wages, tips, other compensation"). [UACL 00838-0083]. Heavin provided Unum with a copy of a February 13, 2004, letter to plaintiff explaining the discrepancy in his W-2s for 2003. [UACL00761; UACL00835-00834].

7

$1821.30 was a 401k withdrawal. [UACL00761-00760]. In follow-up emails, Heavin confirmed that the benefits were *not* included on plaintiff's W-2 as part of his gross wages at the end of the year [UACL00765-00764]. Heavin provided copies of plaintiff's pay stubs and the company payroll ledger [UNUM-2nd-SUPPLEMENT-00370-372]. The payroll ledger revealed that the pre-tax deductions were made but do not reflect any "gross up" at year end. [UNUM-2nd-SUPPLEMENT-00371].

On April 3, 2006, Unum's benefits specialist, Angela W. Fontana, emailed Holmquist, the Unum CPA, asking, "In your opinion, do the contents of the email (UACL00765-00764) resolve the issues that we have been researching regarding the deferred compensation and section 125 issues which were brought up by claimant's attorney?" The CPA responded, "Yes, we now have the reconciliation between the corrected W-2 and the payroll summary from ER (4/3/06), which confirms the 401k and Sec. 125 pre-tax deductions were not added back to the Insured's gross wages." [UACL-SUPPLEMENT-00101]. In a letter dated April 18, 2006, Unum notified counsel for plaintiff it would uphold its decision regarding the calculation of plaintiff's monthly benefit. [UACL00636-00634]. Unum stated:

> Your file was reviewed by our financial consultant, who reviewed additional financial records and contacted David Heavin at Custom Building Systems, Inc. For further information. In response to our inquiry to Mr. Heavin, we received the following correspondence from the controller at MicroMetl: "Barry Schultz's W2 was calculated the same as all the Custom Building System's employees in that the 401k and health (125 cafeteria plan) were excluded from his federal wages and the health expense was excluded from social security [sic.] wages." This information confirms that the 401k and Sec. 125 pre-tax deductions were not added back to your client's gross wages.

[UACL00635].

On May 24, 2006, Unum notified counsel for plaintiff that its review of the calculation of

plaintiff's basic monthly earnings ("BME") had revealed his gross monthly benefit should have been $5728.97 instead of $5804.15, or a difference of $75.18 per month, and the overpaid amount had been included in Unum's Financial Recovery Unit's recalculation of the overpayment to plaintiff due to his primary and dependants' award of Social Security benefits. [UACL00437].

In email correspondence between Unum appeals consultant Cynthia Baker and Sandra Ellis, the Controller of MicroMetl, Ellis confirmed the plaintiff's contributions for long term disability premiums were not included in the section 125 contributions and were not grossed up at the end of the year. [UACL-SUPPLEMENT-00134-00136].

### B. Social Security Cost of Living ("COLA") Adjustments

In July 2005, plaintiff was awarded Social Security benefits, effective February 2004. [UACL00463]. The 2004 monthly Social Security benefit amount was $2,021.50. [UACL00462]. On January 17, 2006, Unum contacted plaintiff, indicating an overpayment due to plaintiff's receipt of Social Security benefits which had not been deducted from his monthly benefits. [UACL01430-UACL01429]. Noting that plaintiff had not responded to its repeated requests for information regarding his Social Security benefit, Unum stated it had estimated the overpayment to be $76,522.13, and requested that plaintiff send a check for that amount to reimburse Unum for the overpayment. [*Id.*]. It advised that plaintiff's net monthly benefit going forward would be reduced to $2,620.15. [*Id.*]. On May 19, 2006, plaintiff provided additional information from the Social Security Administration confirming his three children were receiving family Social Security benefits in the amount of $360 per month per child. [UACL00464-UACL00451]. On May 22, 2006, Unum provided plaintiff with a recalculated overpayment amount. [UACL00471-00470]. A copy of the calculation was attached. [UACL00448]. The letter stated: "As

9

communicated, we must reduce for all Social Security benefits Mr. Schultz and his eligible dependents receive or are entitled to receive as a result of his disability. As a result, we have recalculated his claim to reflect both primary and family Social security benefits." [*Id.*]. Unum calculated it had overpaid plaintiff by $70,809.04. [*Id.*].

Plaintiff appealed the decision, asserting: (1) the Social Security benefits should have been assessed at their value in 1996, the date of the insurance contract, despite the fact that the award was made in 2005 with retroactive payments for much of 2004; and (2) Unum's offset of the children's Social Security benefits against the LTD payment violated federal and state law. [UACL01055-01053]. Unum denied plaintiff's appeal by letters dated April 4, 2006, and May 24, 2006 [UACL-SUPPLEMENT-00102; UACL00443-00434].

### C. Third Party Lawsuit Settlement

On November 21, 2006, plaintiff settled a third party lawsuit against the owner and the manufacturer of the boat involved in the incident giving rise to his disabling injuries. [UNUM-5th Supplement-00150]. Unum followed up with plaintiff's employer and plaintiff in an effort to obtain additional information regarding the settlement. [UACL-SUPPLEMENT-00193; 00203-00204]. In a letter to plaintiff's attorney, Amy Hart, dated April 26, 2007, Unum cited the Policy's provision regarding "deductible sources on income," and advised her that amount received from a third party " by judgment, settlement or otherwise" would be subtracted from the claimant's gross disability payment. [UACL-SUPPLEMENT-00203]. Unum requested that plaintiff immediately forward a copy of any benefit payments by judgment, settlement or otherwise form any third party as a result of the injury. [UACL-SUPPLEMENT-0204]. Unum also sought information from plaintiff's litigation attorney and the boat manufacturer's insurer.

10

[UACL-SUPPLEMENT-00216 and 00206]. Neither plaintiff nor his attorneys provided the requested information. [UACL-SUPPLEMENT-0203-0257]. Ultimately, on June 2, 2008, the boat manufacturer's insurer informed Unum the claim had settled for a total of $603,000.00. [UACL-SUPPLEMENT-00258]. On September 30, 2008, Unum sent a letter to counsel for plaintiff informing her it had received information indicating her client had settled a third party claim in the amount of $603,000.00, notifying her that Unum was pursuing its right to recover the overpayment on her client's claim that resulted from advancing payment rather than offsetting the third party payment, and requesting a complete copy of the settlement and a copy of the closing settlement/disbursement sheet documenting the amount of the client's attorney fees. [UACL-SUPPLEMENT—00268-00269]. Plaintiff's attorney responded by demanding to know the source of the information and requesting copies of all documentation in Unum's possession regarding "any alleged settlement," claiming Unum had no right to any third party settlement and refusing to provide the information requested by Unum. [UACL-SUPPLEMENT-00284–00285]. Finally, on July 19, 2009, plaintiff's attorney informed Unum that the settlement, after attorney fees and litigation expenses, netted a benefit of only $167,847.28. [UNUM-4th Supplement–00004-00006]. No supporting documentation was provided. [*Id.*]. Unum again requested the documentation in a letter dated July 22, 2009. [UNUM-4th Supplement-00008]. No documentation was provided. On December 3, 2009, Unum informed counsel for plaintiff that because the documentation had not been provided, it had estimated attorney fees on the settlement at 25 percent of the gross settlement amount and calculated the offset and overpayment of $106,716.03 based on this estimation. [UNUM-4th Supplement-00031-34]. Unum informed counsel that unless it received the requested documents by February 11, 2010, it would begin to

11

apply a monthly offset to the LTD benefit in the amount of $1,442.12. [*Id.*]. The offset for the third party payment, combined with offsets for primary Social Security and dependent Social Security, would reduce his net monthly benefit from $5,728.97 to $1,255.85. [*Id.*] On February 11, 2010, plaintiff appealed Unum's determination of December 3, 2009. [UNUM-5th Supplement-000028-000035]. Attached as exhibits to the appeal were several documents Unum had been requesting since 2007, including the third party settlement agreement, the third party settlement statement of account with copies of checks received pursuant to the third party settlement, the BCS Irrevocable Special Needs Trust and an accounting for the trust. [UNUM-5th Supplement-000036]. Unum requested additional documentation [UNUM-5th Supplement-000189-190], which counsel for plaintiff provided on April 9, 2010 [UNUM-5th Supplement-000211-245]. On May 7, 2010, Unum informed plaintiff that, based on the information plaintiff provided on appeal, the overpayment amount had been adjusted to $70,735.00 [UNUM-5th Supplement-000266-269]. On May 28, 2010, Unum wrote plaintiff to clarify that the total overpayment had been reduced by $70,735.08, leaving an actual overpayment of $36,186.07. [UNUM-5th Supplement-000287].

## IV. Analysis

Under *Glenn, Hancock* and *Holcomb,* the court must review Unum's calculation of benefits, decision regarding offset for receipt of Social Security benefits, and offset for plaintiff's receipt of a third party settlement according to an arbitrary and capricious standard, and applying a "combination-of-factors" method of review. Plaintiff, as the claimant, bears the burden of proving Unum's decisions were arbitrary and capricious.

### A. Determination of Monthly Disability Payment

Plaintiff asserts Unum incorrectly figured of his monthly long term disability benefit because it excluded LTD premiums. Under the Policy, plaintiff was entitled to receive the lesser of 60% of his monthly earnings or $6,000 per month. "Monthly earnings," in turn, was defined as "your gross monthly income from your Employer in effect just prior to your date of disability." [UACL02819]. The Policy further provided that the gross monthly income " includes your total income before taxes, but does not include deductions made for pre-tax contributions to a qualified deferred compensation plan, Section 125 plan, or flexible spending account." [*Id.*].

Unum's tax department issued 2003 and 2004 W-2's reporting benefit payments as taxable income. Plaintiff sent the tax department an affidavit stating that he was the former President and CEO of Custom Building Systems, Inc., that all of the premium payments to Unum for LTD insurance were made with 100% post-tax dollars, that the Unum premium payments were made by his company "merely for convenience" and were grossed up at the end of the year and included in taxable income on his W-2. Plaintiff attached copies of his W-2 forms for 2000, 2001 and 2002 that reported other amounts received under Box 14 (Other). He did not provide a copy of the 2003 W-2 form from his employer, which reported no other income under Box 14. Without further investigation, the tax department agreed to reclassify the benefit payments for 2003 and 2004 as nontaxable. Plaintiff then pitched the same argument to Unum's benefits department, attaching his 2001 and 2002 W-2 forms (but not his 2003 W-2 form) and checks from Nationwide Insurance which he alleged were refunds for the premium payments. The Benefits Department launched an investigation, obtaining additional records from plaintiff and his former employer. Based on its investigation, Unum's benefits department concluded the monthly benefit

had been properly calculated.

Considerable evidence supports Unum's decision. Under the terms of the Policy, the benefit was to be determined based on plaintiff's gross monthly income "in effect just prior to your date of disability." Thus, the W-2 forms from the employer for 2001 and 2002 are not relevant. The W-2 forms from the employer for 2003 are the relevant W-2's. Those forms did not include any amount for other income in Box 14. Moreover, the employer's vice president of human resources and its controller told Unum that plaintiff was not the owner of the company and never had been; the company did not have a deferred compensation program; the deductions for 401k and flexible spending programs were not included in plaintiff's W-2 as part of his gross wages at the end of the year. Unum's CPA was able to reconcile the corrected W-2 and the payroll summary from the employer, and confirmed the 401k and Sec. 125 pre-tax deductions were not added back to the plaintiff's gross wages.

Under applicable standards, Unum's decision must be upheld unless it is not grounded on any reasonable basis. *Finley,* 379 F.3d at 1176. The decision need not be the only logical one, but rather need only be sufficiently supported to counter a claim that it was arbitrary or capricious. *Id.*[3] Here, Unum conducted a thorough investigation and concluded the premium payments had been made with pre-tax dollars and had not been grossed up at year end.

---

[3] Plaintiff asserts the discrepancy between the tax department's and benefits department's treatment of premiums demonstrates a "conflict of interest" that renders the decision arbitrary and capricious. The court disagrees. The discrepancy likely indicates some kind of disconnect between the two departments, but it does not establish a conflict of interest. In any event, Unum has already acknowledged–and the court has held–that a conflict of interest exists because Unum is both the insurer and plan administrator. This conflict of interest is to be taken into account when there is a close call on a benefits decision. *See Hancock* 590 F.3d at 1155. Unum's decision about treatment of premiums is not a "close call."

Therefore, the court finds substantial evidence supports Unum's decision. Plaintiff's appeal of the calculation of benefits is denied.

## B. Social Security COLA Adjustments

Plaintiff asserts Unum calculated the offset for his Social Security benefit differently than it calculated the offset for the family Social Security benefit. Specifically, plaintiff argues Unum used the primary disability payment in effect in 2003[4] to determine the offset for his Social Security benefit, but used the family benefit in effect in 2005 to determine the offset for family benefits. In support of this theory, plaintiff cites a February 7, 2006, letter from Unum to plaintiff's counsel, which discussed revisions to the primary Social Security benefits calculation but did not discuss similar revisions to the family benefits calculation. [UACL01192-01190]. However, that letter noted, "While you have indicated that you continue to await documentation regarding our clients' Primary Social security benefits you have not advised us of the status of his Family Social Security benefits." [UACL01192]. On May 22, 2006, after plaintiff had provided Unum with information on the family Social Security payments, Unum sent plaintiff a letter which calculated the final overpayment amount. [UACL00471-UACL00451]. Plaintiff's documentation indicated each child would receive $360 per month, starting in March 2006, for a total of $1,080 at 2006 rates. [UACL00464-00451]. This amounted to half of plaintiff's 2006 disability payment of $2,161 [UACL01191]. A review of Unum's calculation shows that Unum applied the same ratio to plaintiff's primary Social Security benefit of $2,021.00 in 2004 to calculate the family benefit at $1,010.00 per month. [UACL00448]. Therefore, the court rejects

---

[4]Plaintiff's reference to 2003 rates appears to be in error. Plaintiff did not begin receiving primary and family Social Security payments until February 2004. Thus, Unum used the primary Social Security disability payment rate in 2004 to determine the offset.

15

plaintiff's assertion that Unum froze the offset for primary Social Security at 2004 rates but froze the offset for family Social Security at 2006 rates. Both the primary and family Social Security benefits were frozen at 2004 rates.

### C. Third Party Lawsuit Settlement

The Policy states: "UNUM will subtract from your gross disability payment....[t]he amount that you receive from a third party (after subtracting attorney's fees) by judgment, settlement or otherwise." [UACL02817-01816]. Plaintiff settled a product liability case against the boat owner and boat manufacturer for $603,000. [UACL-SUPPLEMENT-00258]. After plaintiff refused to provide requested documentation regarding the settlement, Unum calculated an offset and overpayment of $106,716.03 based on estimated attorney fees of 25% of the gross settlement amount. [UNUM-4th Supplement-00031-00034]. Unum notified plaintiff it would begin to apply a monthly offset to his long term disability payment of $1,442.12 unless it received documentation of the actual settlement figures by February 11, 2010. [*Id.*] Based on documentation subsequently supplied by plaintiff, Unum reduced the total overpayment by $7,0735.08, leaving an actual overpayment of $36,186.07. [UNUM-5th Supplement-000287].

Plaintiff does not dispute that the Policy gives Unum the right to offset for third party settlements. He asserts, however, that the "make whole" doctrine bars such an offset. Further, he contends that since the proceeds from the settlement were placed in a special needs trust not in his possession, Unum has no right of offset or reimbursement.

Under Oklahoma law, "a contractual subrogation or reimbursement provision, which contains no priority of payment provision," is not enforceable under Oklahoma law "where the recipient of the benefits sought to be recovered has not been fully compensated by payments from

16

a third party." *Equity Fire and Casualty Company v. Youngblood,* 927 P.2d 572, 574 (Okla. 1996). In *Youngblood,* the Oklahoma Supreme Court stated:

> We adopt the make whole rule in contract subrogation and reimbursement cases where (1) the subrogation or reimbursement contract neither expressly sets priorities for the repayment of benefits, nor otherwise give a right to subrogation or reimbursement before any funds are paid to the beneficiary, nor vests the plan manager's discretionary authority to interpret ambiguous provisions of the plan; and (2) the compensation received by the beneficiary from settlement with or judgment against a third party represents less than full compensation. Under such circumstances, the subrogation and reimbursement terms of the contract will be unenforceable.

*Id.* at 576-77.

"Subrogation simply means substitution of one person for another; that is, one person is allowed to stand in the shoes of another and assert that person's rights against the defendant. Factually, the case arises because, for some justifiable reason, the subrogation plaintiff has paid a debt owed by the defendant." Dan B. Dobbs, *Law of Remedies* §4.3(4) (2d ed. 1993). *See also, Hanover Insurance Company v. Honeywell, Inc.,* 200 F.Supp.2d 1305, 1309-10 (N.D. Okla. 2002) (citing 16 Couch on Insurance §222:5 (Rev.3rd ed.2000) ( "Subrogation is the equitable right of an insurer to be put in the position of its insured so that it may pursue recovery from any third parties who are legally responsible to the insured for a loss paid by the insurer." *See also Morris Zeligson Properties, LLC v. South East Auto Trim, Inc.,* 99 P.3d 744, 747 (Okla. App. 2003).

Here, Unum is not seeking subrogation. It did not pursue recovery from any third party. Rather, the Policy simply requires that plaintiff's receipt of certain moneys–including Social Security disability payments and proceeds from third party settlements–be included as part of the calculation of the monthly LTD payment, and it gives Unum the right to recover for overpayments.

17

Moreover, even if the Policy language were to be construed as a subrogation provision, it would be enforceable under *Youngblood* because it vests Unum with discretionary authority to interpret the terms and provisions of the policy. The "make whole" doctrine does not, therefore, bar Unum from offsetting funds received by plaintiff from a third party settlement. Moreover, by including the value of a third party benefit in the calculation of the benefits calculation, the Policy clearly established a priority of interest, i.e., that the insurer would be entitled to reduce monthly benefits based on the plaintiff's receipt of a third party settlement.

Citing *Great-West Life & Annuity Ins. Co. v. Knudson,* 534 U.S. 204 (2002), plaintiff asserts that since the proceeds of the settlement went straight into a special needs trust and were subsequently spent, Unum is not entitled to an offset. In *Knudson,* an employee benefit plan brought an action for specific performance of a reimbursement provision of the plan, seeking restitution from a plan beneficiary who had recovered from a third-party tortfeasor. The court, in discussing the remedy of restitution, observed, "[W]here the property [sought to be recovered] or its proceeds have been dissipated so that no product remains, [the plaintiff's] claim is only that of a general creditor, and the plaintiff cannot enforce a constructive trust of or an equitable lien upon other property of the defendant." *Id.* at 213-14.

Plaintiff's reliance on *Knudson* is misplaced. Unum has not targeted the settlement proceeds but instead seeks recovery of its overpayments from ongoing monthly benefit payments it makes to plaintiff. *See Cusson v. Liberty Life Assurance Co. of Boston,* 592 F.3d 215,231-32 (1st Cir. 2010) (ERISA did not bar the insurer's claim because it was not attempting to recover its beneficiary's SSDI benefits, but rather sought to recover in equity from funds it had already paid

18

under the LTD plan).[5]

The court rejects plaintiff's appeal of Unum's offset for third party settlement proceeds.

## V. Conclusion

For the foregoing reasons, plaintiff's appeal is denied.

ENTERED this 25th day of February, 2011.

Gregory K. Frizzell
United States District Judge
Northern District of Oklahoma

---

[5]Additionally, the settlement agreement between plaintiff and the third party defendants provided that defendants' payments were to be made by checks made payable to "Barry Schultz" and his attorneys–not to a special needs trust. [UNUM-5th Supplement-000149].